May it please the Court, this case is an appeal from the Board's incorrect and unreasonable construction of the term consignment, which construction enveloped all sales including direct sales. Using that construction, the Board then took two pieces of art that do not describe, let alone mention consignment to find them anticipatory. And on top of that, used vague phrases such as the terms billing and administration of by those two pieces of art. In the very brief at 17, you say that FFF doesn't cite any evidence supporting its inherency argument. You also note, however, that it relies on expert testimony that give, quote, would inherently include creation of orders, close quote. What other type of evidence could a party cite for inherency? For inherency, a party trying to state that a server system in administering a stock of articles is going to create orders for additional products would show that person of skill in the art, that there's inventions at that time, that when you're administering a stock of articles, you always create orders. It has to be an always thing, not a probability, not a possibility. And there, there's just a statement by an expert who says, it's inherent, it would necessarily do that. There's no further- It's always, which means always. It should mean always. There's no showing here that it means always. In fact, if we look at this, the GIB reference that they're talking about, it's a minibar system. There's no showing that a minibar system always creates an order, somehow tells the server or the owner or the supplier of the goods, hey, I need more Coca-Colas. I need more wine in this minibar. There's no showing that it does that whatsoever. And it was for that reason that we said that wasn't sufficient. But all of this comes back to whether GIB and Deering teach consignment, because they don't mention it. And the reason that the board was able to make things that are about direct sales turn into what it thought was consignment was because it started off with the construction of consignment that said all that matters is whether you take the thing out of the cabinet or the product packaging. First of all, GIB and Deering don't teach anything about removing something from product packaging. So the board and FFF's entire reliance on trying to fit GIB and Deering into that definition was based upon removal from the cabinet. Now looking at the issue of removal from the cabinet, that issue is true for every type of sale, direct or consignment. If you walk into 7-Eleven and take something out of the freezer, you took it out of the cabinet. You pay upon checkout. You walk into 7-Eleven, you eat a Snickers bar while you're in the store. You removed it from the product packaging. You have now, according to the board, engaged in a consigned sale. Their definition was no definition whatsoever. There's at least five reasons why the definition of consignment product units was incorrect. Number one, the board admits that it did not use an ordinary construction of the term, that it departed from using an ordinary construction because it thought somehow that it needed to be different based upon the 607 pattern. But in addition, it starts to use a different element of the claim. The claim requires consignment product units and then it requires when the server system removes the unit, is removed from the inventory. So it merged both those concepts. It merged removing from the inventory and removing from the cabinet or the product packaging into the term consignment. It read out a preferred embodiment. There's an embodiment where these cabinets that can be used in hospitals for surgery. So we'd have expensive goods like a blood thinner that may cost $1,000 and the hospital takes out three of these blood thinners, takes it to the surgery room, uses two, returns one. If the construction of the term is removed from the cabinet or product packaging, if it was removed from the cabinet, all three of those would be charged. In a consignment system, according to the 607 invention, it wouldn't have charged for that third one if it was returned timely. In addition, there's a separate preferred embodiment that's discussed in the patent and that was at A505 where you remove the product from the cabinet. You keep it out for too long. You don't return it within the 24 hour time block or the 72 hour time block. The board's construction doesn't encompass that preferred embodiment. And so it's incorrect for those reasons as well. The important part of the phrase that the board relies upon in the 607 patent starts off with a product is not sold when shipped for placement in the cabinet. Are you going to address your standing argument? The standing argument, your honor, is quite simply that in a CBM, the CFR requires the petitioner to claim that it has been sued or charged for infringement. Right. And you say in your blue brief that what FFF did not tell the board is that FFF moved to dismiss the Eastern Texas lawsuit and took the position that the district court lacked subject matter jurisdiction over the action because ABSG allegedly did not own the 607 patent. Yes, sir. Okay. So, did ABSG own the 607 patent? I believe it does. Yes, your honor. Okay. Then why do we care what FFF argued before the district court? Because if FFF has a burden of proof and if FFF... Was FFF not sued for infringement? It was sued for infringement. But in order to be sued for infringement of the patent, it has to be sued by the patentee. That's a requirement of 35 U.S.C. 281 and 35 U.S.C. 100. If they're claiming that they were sued by a stranger, that does not give them the right to file a CBM petition. But you're saying that they're incorrect. They are incorrect, your honor. Then you're saying they have standing. No. I would contend that they have standing. They don't contend they have standing. Well... And even today... If you contend they have standing, then you concede they have standing. No, because they're disputing it. Because even today, they have a motion dismissed that's still pending in the Eastern District of Texas case, and they still have a case pending in California in which they say ABSG is not the patent owner, ASD is the patent owner. And so even after the board's decision, they continue to dispute that ABSG is the patent owner. When they continue to do that, when they make representations in Article III courts and don't change those, then I don't think they can meet their own burden of showing standing. With respect to the term consignment and then its use of trying to find dearing and give to involve consignment, the most important part about dearing that's in the Appendix 789 to 790 is it goes through an analysis and describes how it is that the products are loaded into the cabinet. And the most important part of that is that when the product is loaded into the cabinet, there's a change in control or change in inventory message, number 100, that's described in Figure 3 that is generated and creates billing. This is the same message that FFF relied upon in its petition at A-74 to claim that this taught consignment. But if this court reads that paragraph on pages A-789 and 790 and sees that the change in inventory message is related to the addition of products, then dearing cannot teach consignment. What about the board's later site where they relied on the teaching at JA-791 through 92, which was the idea of when the customer removes one or more products, 90, from the interior of the MW-36 and closes the door 37, then he goes on for wellnesses, invoicing can occur. So why isn't that satisfactory or sufficient evidence to support the board's finding? Because for anticipation, we're going to read the reference as a whole and read it through and see how it teaches, if it teaches the invention in its entirety, in the order, and the elements in which it's arranged. If in the very first place, the micro-warehouse in Deering is loaded and an invoice is created and the customer has been billed already, and then Deering's just acting like a vending machine and a receipt can be created or an invoice can be created. And note, Your Honor, that that sentence says, invoicing can also occur using other, so something else, electronic and non-electronic mechanisms. Well, there's two responses to that. One might be that the prior was teaching different embodiments, and another one might be that your claims are perprising claims. And so if it actually teaches the limitation where when someone removes something from the cabinet and they receive an invoice, why wouldn't that satisfy the claim? Well, it would maybe, you could argue that if you look at invoicing in a vacuum, that that might satisfy some component of the server system creating an invoice. First of all, there's no showing that the server system's creating that invoice. It just is how you can create invoices, electronically or non-electronically. What it doesn't teach, that sentence absolutely does not teach, is a consignment model. It doesn't teach that those products are there and have been shipped to that unit without payment and that they're being held there and that upon use or sale, then that occurs. And because it doesn't teach that, it doesn't teach consignment. And it's the board's construction of consignment just to mean when you remove something from the cabinet, that automatically means consignment. That's not true. That doesn't meet the dictionary definition of consignment. It doesn't meet the definition and the specification of consignment. And so the phrase just generally that invoicing can occur doesn't teach anything about the nature of the products that are stored inside that cabinet. And the same thing happens with GIB. With GIB, you have a minibar, which there's no showing whatsoever in GIB of how those products were built. There's no showing that Coca-Cola and the Robert Mondavi Company and the Mars Company have Cokes and wine and candy bars inside that minibar and they're waiting for payment. And the reason that the board can then take GIB and claim that it teaches consignment is because they've used this generic idea of if you remove something from a cabinet, then it must be. GIB was worried about the fact that when somebody went into a minibar and touched something, it would create a data about there's been a sale and it said, well, we want to teach away from that priority. We want to make this better. You can grab it. You can look at it and you can return it. And that's all it's teaching is how to make a better minibar so a person can look at it. That's like at the grocery store. You can walk up. You can look at the label. You can look at the product. You can put it down. That's not consignment. Can I ask you, where in your blue brief, I'm not talking about what you said before the blue brief to this court, do you say that what the board should have done is adopt a construction of consignment that builds in this requirement of an agent for the seller? In the blue brief? Yes. No, Your Honor. We're not suggesting that it necessarily requires an agent. The agent definition was one example for the Webster's. So it really doesn't matter if Coca-Cola Company or the Robert Mondavi Company owns the goods in the mini-fridge. It's okay if the Hilton Hotel does, and it's the Hilton Hotel that is selling it to you when you take it out and 30 minutes later, the scanning device inside the fridge looks and sees, oh, we're missing a bottle of Coke. It does matter because the very nature of consignment is that a supplier is placing goods at a customer location, allowing them to have use and access to those goods without paying for them. Once the Hyatt Hotel has bought those goods and is putting them in the hotel room for a resale- You're well within your time, just so you know. Yes, Your Honor. That was resale and sale after sale. That's exactly what happens at the mall. You walk into the Gap store, they've bought it from the wholesaler, now the retailer is reselling it. And that's a sale after sale after sale. That's the very problem with the definition of consignment used by the Board. If I may, I'd like to reserve the rest of my time for a moment. You may. Good morning, Your Honors. May it please the Court. The Board properly found here that claims one and two of the 607 patent were both anticipated. If those are two separate and independent references, give and daring either one renders the 607 unpatentable. The idea here is tracking products in a cabinet via RFID tags and triggering invoice or billing from a server system based on products from the cabinet being taken out. Except that idea doesn't really account for the ordinary meaning of the word consignment. Your Honor, and the Board found that the ordinary meaning of consignment did not work here. And that's really what part of this argument that we're having with ABSG is. They want to apply this so-called ordinary meaning of consignment, sort of like a pawn broker or something of that nature. Or at least they did before the Board. I'm not so sure they do here. Well, it's ever shifting, Your Honor. They've had, by my count, three or four different arguments about what consignment means. But we know it doesn't mean the traditional consignment idea where you take a product, put it in the hands of an agent who holds it, sells it to a third party, and then gives the money back to the original person. That's not what we have here. That's not what the Board found. The Board found that the- Right. No, no, no. I'd like you to say, we know that it's not that. Now, tell me why we know that besides the fact that the Board said it, the Board might be wrong. Defend the Board. We know that because the patent owner here in the 607 patent described a consignment in a particular way. They defined consignment as something where the billing occurs, not where the product's put into a cabinet, but when the product is taken out of the cabinet. That's the key. What are you referring to? Your Honor, that is in the 607 patent. It is, the record site is Appendix 497 to 506, and I believe the patent site itself is in Column 6. Price considered sold when removed from the cabinet- What line? What line? What line, please? Your Honor, Column 6, I believe, lines 29 to 32, but that's where the Board decided the rubber met the road on consignment. They said, look, you don't really have an agent here. You have a cabinet. You have an inanimate object in the 607 patent, so it wouldn't be, doesn't make much sense to describe that inanimate object as an agent. So the Court relied on this language from the 607, as well as the overall context to billing when the product is removed and not billing when the product is put in the cabinet to begin with. And they also drew on, the patent draws on this and the Board draws on this, the difference between a direct sale and a consignment sale. The patent talks about that over and over again. It talks about direct sales, talks about consignment sales. And then the patent also has, in Column 7 lines 15 to 18, also talks about the concept of delayed billing. So you might have a situation where the product is removed from the cabinet, but it's not billed right away. But in any event, the Court did not find that that was the traditional common sense meaning of consignment. Right. So I'm not having a lot of difficulty reading this passage in Column 6 as distinguishing two kinds of ways you might put stuff in cabinets, one of which is consignment and one of which isn't. Why would you read a claim that uses the word consignment not to be consignment in the traditional sense? Your Honor, I think you certainly look at all the specification in full context of the patent. In this case, we think the inventor acted as his own lexicographer in a sense and defined consignment in a particular way. Right. They might have done it differently, but the reality is if you look at the context of what this is, which is a cabinet which has stocked items that are billed when they're removed, that is the kind of consignment that this 607 patent is talking about. And we think the Board was correct in finding that. That's an extremely peculiar use of the word consignment, which involves Party A, Party B, Party C. A gives something to B. To sell it to C, that's the first sale. But B has not itself engaged in a sale. That is correct, Your Honor. I think that's why ABSG before the Board had a series of shifting explanations for what consignment should mean. First, they tried the Webster's definition, which the notion of an agent holding it for sale to a third party. The Board rejected that because there's no agent in the 607 patent. They then argued, well, wait a minute, the purchaser... Whoever is operating the cabinet is the agent. Cabinets don't mysteriously appear and operate themselves. Somebody's operating the cabinet. Well, certainly... Stalling it, checking it. The cabinet is put in the room, in this case by the hotel owner. The cabinet is put in the room. You have staff coming in and stocking and restocking. There's no doubt about that. Is there any reason to think that Coca-Cola and Mondavi companies own the little bottles that are in the cabinet in the Hilton Hotel? I don't believe so, Your Honor. Who would call that consignment? The 607 inventor described consignment in that way, Your Honor, and the Board so found. Do you have anything but this passage in column six? Well, Your Honor, I think that passage as well as the general distinction between direct sale that the patent makes where you're billed upon inserting the products in the cabinet versus what it calls a consignment sale, it focuses on when the billing occurs. That's the notion of consignment that this patent uses. The problem I hear from your colleague on the other side is that there's two sales, one when the cabinet is stocked and then another sale when the hotel room user takes the item out. He's saying when you have the sale to the hotel initially, that takes it outside of the realm of consignment. Your Honor, the sale to the hotel at first instance is not what this patent's talking about. This patent's talking about what happens between the interaction between the customer, in this case the hotel guest, and the cabinet. I understand that, but what I'm trying to say is how do you respond to the argument that when there's a first sale to the hotel, it is no longer a consignment, even if there is a sale later to the end user? The first sale from Coca-Cola to the Hyatt, I think that probably is a direct sale, but that doesn't mean that the sale to the eventual hotel room guest is not a consignment product unit under the 607 patent, and that's what the board concluded. You may have different aspects of the sale. We're not saying, and that's why, frankly, the notion of consignment sale, if you just use the ordinary definition, it doesn't work here, and that's why the board looked to the inventor and looked to the patent to decide, okay, what did this inventor mean by the term product consignment units? We believe that that is amply supported by the record. Do you have anything besides the discussion in column six that you're relying on for that? Yes, your honor, as well as the distinction that the patent makes throughout between this notion of direct sales and consignment sales. That's what the board looked to. The prior art here, we believe, is a clear match. It appears to me that, for example, at column seven, line 15, when it refers to implementation where the product is in the cabinet on consignment, the patent is talking about it simply being in the cabinet and available for someone to take it and use it or not use it. Correct, your honor, which makes it different from the example my colleague gives at a 711. You've got products that are put in the cabinet for a potential customer, a specific potential customer in that hotel room, in that pharmacy, whatever it may be. It's not just a big store at Macy's where anybody can go in and pull off something off the shelf. Give and Deering both anticipate the two claims of the 607 patent. The prior art here is a clear match. Give is indeed an invention directed to a hotel minibar, it's at appendix 893. Its items are stored in a cabinet for use by a hotel guest. The guest is billed upon removal of items. This aligns very neatly with the 607 patent, that's at the record site there is 32. In the appendix 870, the language is one or more articles have been taken away from one of the shelves, the guest is charged. The board found that Give discloses this element and that finding is entitled to deferential review. Give also has an administering system for billing a dispensed article. That also aligns with the claim that the server system creates an invoice. This notion that my colleague raised in argument about creating an order and somehow that's not in Give or Deering, I want to respond to that directly. First, it's our position that's waived. That's not an element that they challenged as Give or Deering missing in the board below. They had three opportunities, they actually mentioned three arguments that Give did not mention and one of them was not this ordering concept. And then two, what you have then is you have unrebutted the expert's testimony at A770 paragraph 31, Dr. Billow, that talks about the notion that an order is created in Give. But in any event, we think that argument's waived because it was not properly raised below. With respect to Deering, that's another cabinet that invoices not when you put the products in the cabinet, but when you take them out. As Deering notes, and this is at the appendix 791 to 792, once the customer removes one or more products from the cabinet, the client controller scans the products in the cabinet called a micro-warehouse in Deering and sends an inventory message identifying the missing products in the system and the system performs invoicing for the removed product. That is a fact found by the board, that is to say what Deering discloses is a fact found by the board at appendix 26 and 27. ABSG actually admits that Deering invoices upon removal. That's at appendix 186. That's what they said in their initial filings before the board, that Deering has that element. They try to point to some alleged contradiction within Deering with this so-called integrity algorithm. That's at appendix 790. That does not demonstrate or change the notion that Deering bills upon removal and not upon insertion. Would you talk about the standing argument? Your Honor, the standing argument in our judgment is what the board called specious and we think it is specious. On the record before this court, ABSG is the claimed owner of the 607 patent. Certainly it asserts ownership. My colleague asserted it without qualification or equivocation. We've challenged that assertion below, but there's been no ruling on the merit. So, as things stand today in this court on this record, ABSG is the owner of the 607 patent. So, as such, at the time of the filing of the CBM, FFF had been sued for and charged with infringement of the 607 patent and to suggest otherwise is simply to try to turn the standing argument on its head and indeed the arguments that are made by ABSG in their this notion that there somehow could be a sham lawsuit. Somehow somebody could come up and claim to own a patent and not really own it. That's not in this record at all. That's not something if in fact there's sham lawsuits, the courts have a very, very excellent procedures for dealing with that and that's certainly not the situation. That's not the circumstance we have here. I want to address one other point that came up and that is this notion of that the patents that the board's definition of consignment product units does not cover the 607 embodiments. It's important to note that the board's definition includes this notion that you're billed the products are considered sold when the products are removed from the cabinet or the product packaging. So, you have this concept of delay. I recall that they used the word misconstrued about that argument. Well, your honor, what ABSG argued below was that somehow that the board's definition read out these preferred embodiments and no such thing. The definition includes this notion of you take it out or you remove it from the packaging. Now, it's true. That's really just a proxy for a lot of things that can happen. You can look at it. You can put it back in. But if you can study it, decide you don't want it, put it back in. So, this notion of removal from the packaging is this idea, okay, you've now decided to buy it. You own it. So, it's not just removal from the cabinet. And both Gibb and Deering talk about that as well. Well, it seems to me that what it's talking about is looking at the medical situation as it evolves and deciding whether to use the product or not. And if not, putting it back in and that removing from the packaging is indicative we're using it. Yeah. That is a proxy, Your Honor. I think if you take something out of the packaging, whether it's a set of cookies or whether it's some kind of medical product, if you take it from the package, you've used it, you've bought it, you're going to be billed for it. Your Honors, I'm almost out of time. If the court has any additional questions, I will be pleased to take them.  Thank you, counsel. Your Honor, I'll make three points on rebuttal. The first one is that we have always advocated the plain and ordinary meaning of the term consignment. We've shown different pieces of evidence, the Webster's Dictionary, the APICS Dictionary, Dr. Engel's testimony, as well as the specification itself. There is no counter evidence from FFF to any of those pieces of evidence that would say that you shouldn't- The board's claim construction rests on its view that column six and column seven of this patent make perfectly clear that the word consignment is not being used in the usual sense. So talk about column six and column seven. Why don't they do that? Well, column six, as FFF's counsel said, does not have a clear disavowal of the term consignment, and nor is it an express definition of the term consignment. So the board said, there's a passage, what, 27 to 33 in column six, and then kind of roughly the top half of column seven, that make clear that the only distinction between direct sale and consignment, the board said, has to do with when charging takes place, not whether there is some intermediary party between the owner and the taker-outer. But the problem with that is there's a separate limitation in the claim that relates to the service system creating an order when the item is removed from inventory. So to merge those two together reads out the term consignment. These are supposed to be consignment product units. These are supposed to be product units that are placed in a cabinet for which a supplier has not received payment. And that's the hospital example that's discussed in here, and the way that they read that term. What in your view is the difference between the implementation where there is a direct sale, that's line one of column seven, and implementation where the product is in the cabinet on consignment, that's line 23 of column seven? Your Honor, if you look at column seven, it says that the billing invoice is created when the product units are shipped or when they are detected within the cabinet. So it's upon the addition. On the consignment model, it's not upon addition. It says specifically not sold when shipped for placement, but instead held there and when used either from product packaging or removed from too long, that at that point that there's an invoicing or billing that occurs. I guess what I'm hearing you say just now is exactly what the board said, because what you just said, the difference was, has nothing to do whether there's a third party between the originator and the taker router. It's not the third party. It's that the board construction does not include that first step. They're talking about a direct sale. They don't include the concept that it was not sold when placed into the cabinet. It's your view that there's two direct sales, one to whoever is at the facilities where the cabinet is, and the second is to whoever is the user of the particular item in the cabinet. The way the board's construing it, it's no different than 7-Eleven, a grocery store, any other retail embodiment. It's considered sold when removed from the cabinet or the product packaging. That's what happens to us in everyday life. A consignment requires... Am I correct, though, in my understanding of what your position is? That it's... I didn't ask my question. The way that... Sorry. It wasn't in the form of a question, but is it... Am I correct in understanding that what your position is, is that in a situation where there's an invoice when the inventory is put in the cabinet, that's one direct sale? That's exactly right. And then later when someone takes it out and they're charged, that's a second direct sale? That's exactly right. That's what the board's construction allows to occur, and that's why Deering at 790 and Gibb are both talking about that situation and not the consignment product unit situation. And for those reasons, Deering and Gibb do not anticipate when consignment is properly construed to involve the idea that products are placed somewhere, agent or no agent, Your They're allowed to use it. They're allowed to have it. They can take it to the hospital. I like your argument. You're well-off. Just like the hospital room could take the product, put it in the surgery room, put it back, it never gets charged. That's the very concept of consignment taught of these pharmaceutical products that are discussed in the 607 patent. Deering and Gibb don't teach that. We request that the court reverse. Thank you, Your Honor. Thank you, counsel. Matter stands submitted.